**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| JESSICA DAVIS; GERALD HEATON; B.H., a minor, by and through his parents and natural guardians, JESSICA DAVIS and GERALD HEATON; E.H., a minor, by and through his parents and natural guardians, JESSICA DAVIS and GERALD HEATON; CHRISTOPHER AMMON; ANITA AMMON; CHASE AMMON; and TODD HART, each individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>          v.<br><br>NORFOLK SOUTHERN RAILWAY COMPANY and NORFOLK SOUTHERN CORPORATION,<br><br>      Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Jessica Davis; Gerald Heaton; B.H., a minor, by and through his parents and natural guardians, Jessica Davis and Gerald Heaton; E.H., a minor, by and through his parents and natural guardian, Jessica Davis and Gerald Heaton; Christopher Ammon; Anita Ammon; Chase Ammon and Todd Hart (collectively, "Plaintiffs"), each individually and on behalf of all others similarly situated, bring this action against Defendants Norfolk Southern Railway Company and Norfolk Southern Corporation (collectively, "Defendant") and allege as follows based on personal knowledge as to their own acts and on investigation conducted by counsel as to all other allegations:

**<u>INTRODUCTION</u>**

1

1.     This class action brought on behalf of Plaintiffs individually, and on behalf of all others similarly situated, for injuries, damages, injunctive, equitable and declaratory relief, arising from reckless and negligent acts and omissions in connection with the February 3, 2023, derailment of a freight train owned and operated by Defendant in East Palestine, Ohio.

2.     The derailment caused the release, burning, and emission of hazardous chemicals, including vinyl chloride, phosgene, hydrogen chloride, butyl acrylate, ethylhexyl acrylate, and diethylene glycol, and potentially including isobutylene and ethylene glycol monobutyl ether (collectively, "Hazardous Chemicals"), which spread in dangerous and harmful amounts throughout the area surrounding the derailment.

3.     As a direct and proximate result of Defendant's conduct, including the train derailment and its proximate aftereffects, efforts to put out the ensuing fire, burning of the Hazardous Chemicals, and leaking of Hazardous Chemicals into the air, ground, and water (collectively, "Train Derailment"), Plaintiffs and Class members have been injured and sustained damages. Plaintiffs and Class members are further entitled to a medical monitoring program to monitor for the risks of illness, diseases and health conditions caused by exposure to hazardous chemicals.

4.     Plaintiffs bring this suit on behalf of themselves and all those similarly situated to recover damage for property damage, loss of use and enjoyment of their property, costs and expenses incurred and to be incurred, and other damages, and to seek monitoring for health risks and medical conditions that they face as a result of the exposure to the dangerous and harmful effects of the chemicals.

**PARTIES**

### I.  Ohio Plaintiffs[1]

5.      Plaintiff Jessica Davis is a citizen and resident of East Palestine, Ohio with an address of 292 East Highland Avenue, East Palestine, Ohio 44413. Plaintiff Jessica Davis lives within 1 mile of the Train Derailment along with her co-Plaintiff fiancé, Gerald Heaton, and two minor sons, B.H. and E.H., both also co-Plaintiffs. As a direct and proximate result of the Train Derailment, Plaintiff Jessica Davis was exposed to the dangerous and hazardous chemicals and aftereffects, and now faces health risks as a result of her exposure in addition to economic loss as a result of the Train Derailment.

6.      Plaintiff Gerald Heaton is a citizen and resident of East Palestine, Ohio with an address of 292 East Highland Avenue, East Palestine, Ohio 44413. Plaintiff Gerald Heaton lives within 1 mile of the Train Derailment along with his co-Plaintiff fiancé, Jessica Davis, and two minor sons, B.H. and E.H., both also co-Plaintiffs. As a direct and proximate result of the Train Derailment, Plaintiff Gerald Heaton was exposed to the dangerous and hazardous chemicals and aftereffects, and now faces health risks as a result of his exposure in addition to economic loss as a result of the Train Derailment. Further, Gerald Heaton was caused to suffer wage loss as a result of the incident.

7.      Plaintiff B.H. is a minor who brings this action by and through his parents, natural guardians, and co-Plaintiffs, Jessica Davis and Gerald Heaton. Plaintiff B.H. is a citizen of and resident of East Palestine, Ohio with an address of 292 East Highland Avenue, East Palestine, Ohio 44413. Plaintiff B.H. lives within 1 mile of the Train Derailment along with his parents and co-Plaintiffs, Jessica Davis and Gerald Heaton, as well as his brother E.H., also a co-Plaintiff. As a

---

[1] All of the Plaintiffs named in this Complaint were affected by the Train Derailment that occurred on February 3, 2023, in East Palestine, Ohio. However, different causes of action are brought based upon each Plaintiff's residency and proximity to the train derailment, as residents of both Ohio and Pennsylvania were impacted by the event.

direct and proximate result of the Train Derailment, Plaintiff B.H. was exposed to the dangerous and hazardous chemicals and aftereffects, and now faces health risks as a result of his exposure.

8.      Plaintiff E.H. is a minor who brings this action by and through his parents, natural guardians, and co-Plaintiffs, Jessica Davis and Gerald Heaton. Plaintiff E.H. is a citizen of and resident of East Palestine, Ohio with an address of 292 East Highland Avenue, East Palestine, Ohio 44413. Plaintiff E.H. lives within 1 mile of the Train Derailment along with his parents and co-Plaintiffs, Jessica Davis and Gerald Heaton, as well as his brother B.H., also a co-Plaintiff. As a direct and proximate result of the Train Derailment, Plaintiff E.H. was exposed to the dangerous and hazardous chemicals and aftereffects, and now faces health risks as a result of his exposure.

9.      Plaintiff Christopher Ammon is a citizen and resident of East Palestine, Ohio with an address of 6491 State Route 170, East Palestine, Ohio 44413. Plaintiff Christopher Ammon lives approximately 1-2 mile(s) outside of the 1-mile Train Derailment evacuation zone along with his co-Plaintiff wife, Anita Ammon, and adult son, Chase Ammon, also a co-Plaintiff. As a direct and proximate result of the -Derailment, Plaintiff Christopher Ammon was exposed to the dangerous and hazardous chemicals and aftereffects, and now faces health risks as a result of his exposure in addition to economic loss as a result of the Train Derailment.

10.     Plaintiff Anita Ammon is a citizen and resident of East Palestine, Ohio with an address of 6491 State Route 170, East Palestine, Ohio 44413. Plaintiff Anita Ammon lives approximately 1-2 mile(s) outside of the 1-mile Train Derailment evacuation zone along with her co-Plaintiff husband, Christopher Ammon, and adult son, Chase Ammon, also co-Plaintiff. As a direct and proximate result of the -Derailment, Plaintiff Anita Ammon was exposed to the dangerous and hazardous chemicals and aftereffects, and now faces health risks as a result of her exposure in addition to economic loss as a result of the Train Derailment.

11.     Plaintiff Chase Ammon is a citizen and resident of East Palestine, Ohio with an address of 6491 State Route 170, East Palestine, Ohio 44413. Plaintiff Chase Ammon lives approximately 1-2 mile(s) outside of the 1-mile Train Derailment evacuation zone along with his co-Plaintiff parents, Christopher and Anita Ammon. As a direct and proximate result of the Train Derailment, Plaintiff Chase Ammon was exposed to the dangerous and hazardous chemicals and aftereffects, and now faces health risks as a result of his exposure in addition to economic loss as a result of the Train Derailment.

**II.  Pennsylvania Plaintiff**

12.     Plaintiff Todd Hart is a citizen and resident of Darlington, Pennsylvania with an address of 127 Taggart Road, Darlington, PA 16115. Plaintiff Todd Hart lives within 1.4 miles of the Train Derailment. As a direct and proximate result of the Train Derailment, Plaintiff Todd Hart was exposed to the dangerous and hazardous chemicals and aftereffects, and now face health risks as a result of his exposure. As a direct and proximate result of the Train Derailment, Plaintiff was forced to evacuate and has suffered economic loss as a result of the incident.

**III.  Defendant**

13.     Defendant Norfolk Southern Railway Company is a Virginia corporation with its principal place of business in Norfolk, Virginia.

14.     Defendant Norfolk Southern Corporation is a Virginia corporation with its principal place of business in Atlanta, Georgia. Defendant Norfolk Southern Railway Company is a wholly owned subsidiary of Defendant Norfolk Southern Corporation.

<u>**JURISDICTION AND VENUE**</u>

15.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000 and is between citizens of different states. This Court

also has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the proposed Class who are diverse from Defendant, and (4) there are more than 100 proposed Class members.

16.     This Court has personal jurisdiction over Defendant because Plaintiff's claims arise out of Defendant's contacts with this district.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## **FACTUAL ALLEGATIONS**

### **I.  Facts Common to All Causes of Action**

18.     On February 3, 2023, a freight train owned and operated by Defendant derailed in East Palestine, Ohio.

19.     The train had 141 cars, about 50 of which derailed, and approximately 10 of which were carrying Hazardous Chemicals.

20.     An investigation by the National Transportation Safety Board revealed that the derailed was likely caused by a mechanical problem with one of the car's axles.

21.     Due to the presence of the Hazardous Chemicals, firefighters were unable to safely put out the ensuing fire.

22.     Instead, the safest option to prevent a massive explosion as determined by the emergency responders was to permit the Hazardous Chemicals to slowly burn over the course of a few hours until they burned out.

23.     Among the Hazardous Chemicals which are confirmed to have breached, burned, or emitted were vinyl chloride, phosgene, hydrogen chloride, butyl acrylate, ethylhexyl acrylate, and diethylene glycol.

24.     Among the Hazardous Chemicals on the train which have unknown status and were potentially breached, burned, or emitted were isobutylene and ethylene glycol monobutyl ether.

25.     Vinyl chloride is an industrial precursor used in the production polyvinyl chloride. Inhalation of vinyl chloride can cause dizziness, drowsiness, headache, unconsciousness, blurred vision, numbness, tingling sensation, lowering of consciousness, convulsions, seizures, damage to bones, damage to the liver, birth defects, fetal mortality, and various cancers, including liver (hepatic angiosarcoma and hepatocellular carcinoma), brain, lung, breast, and blood cancers, lymphoma, and leukemia. Exposure of vinyl chloride to the eyes can cause redness, irritation, and pain. Exposure to vinyl chloride may have effects on the liver, spleen, blood, peripheral blood vessels, tissue and bones of the fingers, and human reproduction and development. Pregnant women, infants, and young children are at greater risk of illness and cancer from exposure to vinyl chloride. Vinyl chloride is a confirmed human carcinogen. Vinyl chloride is stored as a liquefied gas which becomes a gas when depressurized. Depressurization into a gas quickly results in a harmful concentration in the air. Vinyl chloride gas is heavier than air and thus stays at ground level when released, presenting a danger to people, animals, and property at ground level. Vinyl chloride damages iron and steel in the presence of moisture. Burning vinyl chloride releases phosgene and hydrogen chloride. The OSHA permissible exposure limit for vinyl chloride is 1 ppm TWA. OSHA dictates medical surveillance when a person is exposed to a concentration of vinyl chloride of 0.5 ppm averaged over an 8-hour work day.

26.     Phosgene is an extremely poisonous gas that was used as a chemical weapon in World War I. Inhalation of phosgene can cause cough, sore throat, chest tightness, shortness of breath, nausea, vomiting, lung oedema, and chemical pneumonitis. Phosgene gas is heavier than air and thus stays at ground level when released, presenting a danger to people, animals, and property at ground level. Phosgene damages metals in the presence of moisture. The OSHA permissible exposure limit for phosgene is 0.1 ppm TWA.

27.     Hydrogen chloride is an extremely poisonous gas. Inhalation of hydrogen chloride can cause cough, sore throat, burning sensation, shortness of breath, labored breathing, asthma-like reactions (RADS), asphyxiation due to swelling in the throat, and lung oedema. Inhalation of high concentrations may cause pneumonitis. Exposure of hydrogen chloride to the skin can cause redness, pain, and serious skin burns. Exposure of hydrogen chloride to the eyes can cause redness, pain, blurred vision, and severe burns. Hydrogen chloride gas is heavier than air and thus stays at ground level when released, presenting a danger to people, animals, and property at ground level. Hydrogen chloride produces a strong acid in solution with water. Hydrogen chloride is highly corrosive and damages metals in the presence of moisture. The OSHA permissible exposure limit for hydrogen chloride is 2 ppm STEL.

28.     Butyl acrylate is an industrial precursor used in the production of polymers. Inhalation of butyl acrylate can cause burning sensation, cough, shortness of breath, and sore throat. Exposure of butyl acrylate to the skin or eyes can cause redness and pain. Ingestion of butyl acrylate can cause abdominal pain, nausea, vomiting, and diarrhea. The OSHA permissible exposure limit for butyl acrylate is 2 ppm TWA.

29.     Ethylhexyl acrylate is an acrylate used in the production of acrylate adhesives. Inhalation of ethylhexyl acrylate can cause cough and sore throat. Exposure of butyl acrylate to

the skin or eyes can cause redness and pain. Ingestion of ethylhexyl acrylate can cause abdominal pain, nausea, vomiting, and diarrhea.

30.     Diethylene glycol is a solvent used in the production of many types of products. Because of its high toxicity in low concentrations, diethylene glycol has been responsible for numerous mass poisonings in consumer products. Ingestion of diethylene glycol can cause abdominal pain, nausea, vomiting, diarrhea, dizziness, drowsiness, confusion, and unconsciousness, kidney failure, and effects on the central nervous system and liver.

31.     Isobutylene is a hydrocarbon used in the production of many types of products. Inhalation of isobutylene can cause dizziness, drowsiness, lethargy, nausea, unconsciousness, vomiting, and effects on the central nervous system. Isobutylene gas is heavier than air and thus stays at ground level when released, presenting a danger to people, animals, and property at ground level. The OSHA permissible exposure limit for isobutylene is 250 ppm TWA.

32.     Ethylene glycol monobutyl ether is an organic compound used in the production of polyester and antifreeze. Inhalation of ethylene glycol monobutyl ether can cause cough, dizziness, drowsiness, headache, nausea, and weakness. Exposure of ethylene glycol monobutyl ether to the eyes can cause redness, pain, and blurred vision. Ingestion of ethylene glycol monobutyl ether can cause abdominal pain, nausea, vomiting, diarrhea, and effects on the central nervous system, blood, kidneys and liver. Ethylene glycol monobutyl ether can be absorbed through the skin. The OSHA permissible exposure limit for butyl acrylate is 20 ppm TWA.

33.     The train cars carrying vinyl chloride had the DOT 105J300W specification and carry 263,000 pounds of vinyl chloride each.

34.     Five train cars holding vinyl chloride were vented and burned, releasing 1.315 million pounds of vinyl chloride and its combustion byproducts, including phosgene and hydrogen

9

chloride that contaminated and continued to contaminate the environment and cause injury to the Plaintiffs and similarly situated class members

35.     In an attempt to limit residents' exposure to the harmful and dangerous chemicals the surrounding area was evacuated. The area evacuated had an area of roughly 2 square miles and was evacuated for roughly 3 days.

36.     At 1.315 million pounds of vinyl chloride and its combustion byproducts over an area of 2 square miles, there was roughly 10.7 grams of the dangerous and harmful chemicals per square foot of land area over the course of 3 days.

37.     Because vinyl chloride, phosgene, and hydrogen chloride are heavier than air, they sink to ground level in higher concentrations.

38.     A column of air of that is 1 square foot and 6 feet tall weighs approximately 219.6 grams.

39.     The concentration of vinyl chloride and its combustion byproducts therefore was approximately 4.9% (49,000 ppm) over the course of 3 days or 0.54% (5,400 ppm) over an average 8-hour period.

40.     5,400 ppm of vinyl chloride over an 8-hour period is extremely dangerous and well above the OSHA permissible exposure limit of 1 ppm TWA.

41.     The highest concentrations of Hazardous Chemicals into the air were within the first few hours of the derailment, before there was active monitoring of contaminant levels, before there was an active emergency response, and before most residents evacuated.

42.     The governors of Ohio and Pennsylvania ordered evacuations within a 2-mile area surrounding the derailment.

43.     The derailment resulted in Hazardous Chemicals leaking into the nearby ground, groundwater and waterways.

44.     The evacuation orders were lifted three days later on February 9, 2023.

45.     The derailment, leak of Hazardous Chemicals, fire, and subsequent efforts to extinguish the fire resulted in Hazardous Chemicals leaking into the surrounding area in damaging and unsafe amounts.

46.     The Hazardous Chemicals caused damage to the environment and property in the surrounding area.

47.     The Hazardous Chemicals caused direct and immediate health consequences to the the people (including the Plaintiffs) in the surrounding area.

48.     The Hazardous Chemicals created a substantial risk of developing serious and harmful health conditions and consequences in the people in the surrounding area.

49.     Residents reported chemical odors and burning sensations in their eyes in the areas near the derailment.

50.     Residents as far as Mahoning and Trumbull counties reported chemical odors after the derailment.

51.     Residents reported finding dead fish, chickens, birds, foxes, cats, and dogs in the areas near the derailment.

52.     Due to the presence of Hazardous Chemicals in the air, land, and water and damage already caused by the Hazardous Chemicals to property, property values will be negatively affected and diminished.

**II.  Facts Specific to Plaintiffs Jessica Davis, Gerald Heaton, B.H., and E.H.**

53.     As previously mentioned, Plaintiffs Jessica Davis and Gerald Heaton are an engaged couple who live together with their children, B.H. and E.H., within the 1-mile radius from the Trail Derailment.

54.     On the night of the Train Derailment, February 3, 2023, on or around 9 PM or 10 PM, Jessica Heaton was the only individual awake in her home when she received an alert on her phone that she needed to evacuate her house immediately. Soon after, she received an automated phone call alerting her of the same. This call indicated that residents of East Palestine needed to evacuate immediately and if individuals did not have transportation, busses would be provided for evacuation.

55.     Jessica Davis woke up Gerald Heaton. The two looked out of their home window and saw a fire ablaze.

56.     At this time, residents were not told what occurred that necessitated the evacuation, but the alerts on Jessica Davis's phone mentioned a gas station, Leake Oil. Accordingly, Jessica Davis assumed that there was a fire at Leake Oil that would resolve shortly thereafter.

57.     Complying with the alerts requesting evacuations, Jessica Davis and Gerald Heaton woke up their children B.H. and E.H., ages 7 and 6 respectively, and got in the car to drive away from the fire.

58.     The family did not know where to go or for how long they needed to be away from their home, so they drove around backroads and ultimately parked the car for several hours to get some rest.

59.     During this time, an officer rang the family's camera doorbell to confirm that the family had evacuated. Through the doorbell's speaking features, Jessica Davis and Gerald Heaton remotely answered the doorbell to confirm to the officer that the family had evacuated their home.

12

60.     Around 4 AM on Saturday, February 4, 2023, after speaking to other neighbors who went back to their homes, the family made the decision to return home because the family thought it was safe to return.

61.     After returning home, Jessica Davis heard several loud explosions and saw the night sky erupt with fire and smoke on multiple occasions. Still, at this time, the family was not aware of the Train Derailment and subsequent fires that occurred therefrom.

62.     After being home for a few hours in the morning of February 4, 2023, Jessica Davis awoke to her home smelling like chemicals. Around this time, a family member called Jessica Davis to explain that a train derailed, but the family still did not know about the any possible dangers of hazardous chemicals.

63.     That day, on February 4, 2023, the whole family began experiencing headaches and sore throats. B.H., who suffers from chronic asthma, also experienced some difficulty breathing.

64.     However, without knowing exactly the dangers of the Train Derailment, the family stayed in their home Saturday night.

65.     Late on Sunday, February 5, 2023, on or around 8 PM or 9 PM, Jessica Davis was watching a press conference regarding the Train Derailment, when the individuals participating in the press conference urgently stated that the residents of East Palestine needed to evacuate immediately because the safety features of the train were failing and explosions could occur at any time.

66.     This was the first time Jessica Davis and her family were alerted of the imminent dangers of the Train Derailment.

67.     Accordingly, Jessica Davis and Gerald Heaton grabbed a few household necessities and their children, B.H. and E.H., and left their dogs and their home to find quick safety with a family friend in Leetonia, Ohio.

68.     Once in Leetonia, Ohio, after watching the news, the family learned that at this time, evacuations were mandatory, and individuals that did not evacuate East Palestine would be criminally charged.

69.     The next morning, on Monday, February 6, 2023, the family was alerted that roads were soon going to be blocked entering East Palestine. Accordingly, Gerald Heaton quickly went home to retrieve the family's two dogs.

70.     Thereafter, from February 6, 2023, until February 10, 2023, the family stayed at various hotels for shelter. Originally the family stayed at the Davis Motel in North Lima, Ohio; however, after the toxic smell of chemicals continued to spread as the days passed, the family continued to move further away from the Train Derailment, ultimately staying in Lisben, Ohio at the Days Inn.

71.     B.H. and E.H.'s school, East Palestine Elementary, was closed from Monday, February 6, 2023, until February 10, 2023; however, once the school reopened on Monday, February 13, 2023, Jessica Davis and Gerald Heaton were concerned about sending their children back to school, as the school building was used as a base for first responders reporting to the Train Derailment.

72.     Upon arriving back home on February 10, 2023, the family's entire home smelled like chemicals similar to the smell of nail polish remover.

73.     B.H. suffered an asthma attack that required him to use his emergency inhaler. Gerald Heaton removed B.H. from the house temporarily while his symptoms occurred to get some fresh air.

74.     Jessica Davis then began cleaning every surface in their home to attempt to clean it from any possible toxic contamination. Jessica Davis wiped the whole house down as there was a lot of dust throughout the interior of the house and sticky grey ash covering the exterior of the home.

75.     Jessica Davis took both of her children, B.H. and E.H., to the children's pediatrician on February 13, 2023, as the kids continued to have sore throats, headaches, and eye irritation. The pediatrician confirmed that the children were negative for Strep throat but that the symptoms could be from the Train Derailment and subsequent fires and explosions.

76.     Gerald Heaton missed three days of work as a truck driver due to the Train Derailment and the family's subsequent displacement.

77.     To date, the family still continues to suffer as a result of the Train Derailment with physical symptoms, economic loss, and emotional distress.

78.     The family is still being alerted by officials to not use their city tap water and only drink bottled water, and while the authorities are reporting that the air quality is safe, the family is concerned for their health as a result of the toxic exposure.

79.     B.H. and E.H. have also suffered psychological trauma as a result of the Train Derailment and have attended, and will continue to attend, counseling services for their emotional trauma.

80.     Further, according to Zillow.com, the family's home value has dropped $30,000-$40,000 immediately following the incident, causing the family to fear that the will be unable to sell their home for fair value in the future.

### III.  Facts Specific to Plaintiffs Christopher Ammon, Anita Ammon, and Chase Ammon

81.     Plaintiffs Christopher Ammon, Anita Ammon, and Chase Ammon live together approximately 1-2 miles outside of the 1-mile Train Derailment evacuation zone.

82.     On the night of Friday, February 3, 2023, the Ammon family was far from their home.

83.     The next day, while Christopher Ammon was at work and his wife, Anita Ammon was still at home, Anita called Christopher to inform him of a horrible smell wafting into their home. At this time, the family was not aware of the potential hazardous fumes that surrounded the area.

84.     Since the Ammon family was outside of the 1-mile evacuation zone, authorities did not require the Ammon family to evacuate or warn them of the potential dangers of the nearby Train Derailment.

85.     Out of caution, the family fled their home on Monday, February 6, 2023, at or around 3:30 PM until 8:30 PM while the derailed tank was scheduled to be ignited.

86.     Christopher Ammon, Anita Ammon, and Chase Ammon have suffered from headaches and sore throats since the incident.

87.     The Ammon family's home is approximately 25 feet away from a creek that has since changed colors from the Train Derailment contamination and now contains only dead fish.

88.     The Ammon family have well water that they have not used since Saturday, February 4, 2023. To date, the family has only used bottled water to drink and cook.

16

### IV.  Facts Specific to Plaintiff Todd Hart

89.    Plaintiff Todd Hart lives 1.4 miles away from the Train Derailment in Beaver County, Pennsylvania with his wife, Heidi Hart; two minor children, ages 4 and 2; and adult stepdaughter, who was residing at Slippery Rock University at the time of the incident.

90.    On Friday, February 3, 2023, Plaintiff Todd Hart and his family were home when they saw and heard fire trucks and other emergency vehicles driving past their home.

91.    Once the family looked out of the window, they saw flames in the distance.

92.    Plaintiff Todd Hart's wife, Heidi Hart, first learned that there was a nearby Train Derailment after seeing others report about it on social media. At this time, the family learned that the Train Derailment was by Leake Oil, a nearby gas station.

93.    Being fearful of various propane tanks, including one on their property, exploding from the incident, the family decided to evacuate their home on or around 10 PM on February 3, 2023. That night, the family stayed with Heidi Hart's parent's home which was a little further away from the incident.

94.    Plaintiff Todd Hart and his family did not return home until Saturday, February 4, 2023, on or around 5 PM. At that time, Plaintiff Todd Hart and his family did not hear of any alerts that required them to stay away from the Derailment site and were not aware of a toxic exposure therefrom.

95.    The next day, on Sunday, February 5, 2023, Plaintiff Todd Hart received a text message from his mother, a resident of East Palestine, Ohio, informing him that East Palestine residents were instructed to evacuate.

96.    While Plaintiff Todd Hart was subscribed to emergency alerts for Beaver County, he did not receive any notifications for him and his family to evacuate.

97.     Being only 1.4 miles away from the Derailment, Todd Hart became concerned and called 9-1-1 to ask whether he and his family should leave their home. After explaining to the 9-1-1 dispatcher where his home was located, the 9-1-1 dispatcher informed Todd Hart that his home was right at the border of the evacuation site.

98.     After learning this, Todd Hart and his family decided to evacuate their home and found shelter at the Fairfield Suites in Monaca, PA from Sunday, February 5, 2023, until Tuesday, February 7, 2023.

99.     On Tuesday, February 7, 2023, after keeping apprised with the news and seeing that the evacuation site was only for the 1-mile radius of the Train Derailment, Todd Hart and his family returned home.

100.     Todd Hart, who is a Large Bank Examiner, missed three days of work due to the incident, and Heidi Hart, who works for Prevention Network, missed the entire week of work as a result of the incident.

101.     To date, the family remains anxious as a result of the Train Derailment, and is fearful of water contamination, air quality, and their home's value.

102.     Todd Hart and his family have well water and have not used their home's water supply since the incident. The family is using bottled water to drink, cook, and wash their faces for the time being, and the family is researching long-term water filtration systems.

## CLASS ALLEGATIONS

103.     Plaintiffs, individually and on behalf of all others similarly situated, bring this class action pursuant to Fed. R. Civ. P. 23.

104.     The proposed Class is made up of an **Ohio Subclass** and a **Pennsylvania Subclass**, each with the following subclasses:

**Medical Monitoring Subclass:** All persons who were present within the area contaminated by the 2023 East Palestine, Ohio train derailment and its proximate aftereffects.

**Property Damage Subclass:** All individuals and entities that own property within the area contaminated by the 2023 East Palestine, Ohio train derailment and its proximate aftereffects.

**Economic Loss Individual Subclass:** All persons who were required to evacuate from the area contaminated by the 2023 East Palestine, Ohio train derailment and its proximate aftereffects.

**Economic Loss Business Subclass:** All businesses that were required to cease or limit operations in the area contaminated by the 2023 East Palestine, Ohio train derailment and its proximate aftereffects.

105.    The proposed Class excludes the following: Defendant, its affiliates, and its current and former employees, officers and directors, and the Judge assigned to this case.

106.    Plaintiffs reserve the right to modify, change, or expand the definition of the proposed Class based upon discovery and further investigation.

107.    *Numerosity*: The proposed Class is so numerous that joinder of all members is impracticable. The proposed Class is made up of individuals, property owners, and businesses present within the area contaminated by the 2023 East Palestine, Ohio train derailment, which has a population of approximately 4,718.

108.    *Commonality*: Questions of law or fact common to the proposed Class include, without limitation:

a.      Whether Plaintiffs and Class members were injured;

b.      Whether Defendant's conduct creates a substantial risk that Plaintiffs and Class members will develop serious health consequences that necessitate medical monitoring;

c.      Whether Defendant trespassed on property;

d.      Whether Defendant created a nuisance;

     e.     Whether Defendant was negligent;

     f.     Whether Defendant engaged in abnormally dangerous activity;

     g.     Whether Defendant is strictly liable for the injuries caused by their conduct;

     h.     Whether Defendant acted with intentional, willful, or reckless disregard for rights and safety of others; and

     i.     Whether Defendant is liable for punitive damages.

109. *Typicality*: Plaintiff's claims are typical of the claims of proposed Class members. Plaintiffs and proposed Class members were injured and suffered damages in substantially the same manner, have the same claims against Defendant relating to the same course of conduct, and are entitled to relief under the same legal theories.

110. *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the proposed Class and has no interests antagonistic to those of the proposed Class. Plaintiffs have retained counsel experienced in the prosecution of complex class actions, including actions with issues, claims, and defenses similar to the present case. Class Counsel was named lead counsel for a medical monitoring class in the following cases:

     a.     *In re: Asbestos School Litigation*, No. 83-0263 (E.D. Pa.) (Levin Sedran & Berman as member of Executive Committee and Lead Trial Counsel obtained a certification of a nationwide class and settlement on behalf of school districts that included pioneering the 50-state analysis of the law to meet class certification requirements);

     b.     *In re: Three Mile Island Litigation,* Civil Action No. 79-0432 (M.D. Pa.) (Levin Sedran & Berman as a member of Executive Committee that obtained a settlement that included the establishment of a medical monitoring fund);

     c.     *In re: Diet Drug Product Liability Litigation*, MDL No. 1203 (E.D. Pa.) (Levin Sedran & Berman as Liaison and Co-Lead Counsel obtained a $6.75 billion-dollar settlement on behalf of consumers who ingested Fen-Phen); and

      d.    *In re: National Football League Players' Concussion Injury Litigation*, MDL No. 2323 (E.D. Pa.) (Levin Sedran & Berman as Subclass Counsel working along with Lead Counsel obtained an uncapped settlement having a value that exceeds $1 billion dollars on behalf of NFL football players).

111.    *Predominance and superiority*: Questions of law or fact common to proposed Class members predominate over any questions affecting individual members. A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all members of the proposed Class is impracticable and the amount at issue for each proposed Class member would not justify the cost of litigating individual claims. Should individual proposed Class members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

112.    Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

113.    Defendant has acted, and refused to act, on grounds generally applicable to the proposed Class, thereby making appropriate final equitable relief with respect to the proposed Class as a whole.

114.    Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(2).

## CAUSES OF ACTION

### COUNT I
### MEDICAL MONITORING
**(on behalf of the Class)**

115.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

116.    Defendant has a duty to operate its railroads in a safe and responsible manner.

117.    Defendant has a heightened duty of care when dealing with Hazardous Chemicals that can cause injury to people, animals, and the environment.

118.    Defendant breached its duty of care by failing to adequately and safely maintain or operate its trains.

119.    Defendant's breach proximately caused a mechanical failure of an axle on a train carrying Hazardous Chemicals, resulting in a train derailment, leak of Hazardous Chemicals, spread of Hazardous Chemicals throughout the surrounding area, and evacuation.

120.    Defendant's negligence resulted in Plaintiffs and Class members being exposed to Hazardous Chemicals in unsafe and dangerous amounts.

121.    Exposure to these Hazardous Chemicals creates a substantial and increased risk of developing a serious latent illness, including various forms of cancer, birth defects, and effects on the liver, spleen, blood, peripheral blood vessels, tissue and bones of the fingers, and human reproduction and development. There is greater risk for young children and women who are pregnant.

122.    The development of these diseases, illnesses and medical conditions can be detected through unique medical screening that is different from routine medical screening.

123.    Regular medical screening for these illnesses, diseases, and medical conditions is reasonably necessary under the circumstances because Plaintiffs and Class members were exposed

22

to harmful levels of Hazardous Chemicals, the potential illnesses, diseases and medical conditions are serious and life-threatening, and the benefits of screening substantially outweigh the costs.

124.    Early detection and treatment of these diseases, illnesses and medical conditions, and especially cancer, substantially improves the likelihood of a positive response to treatment.

125.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been injured and are entitled to a medical monitoring program to monitor for the risks of illness caused by exposure to hazardous chemicals.

**COUNT II**
**TRESPASS**
**(on behalf of the Class)**

126.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

127.    Defendant intentionally, willfully, recklessly, and negligently operated its train loaded with Hazardous Chemicals despite there being a mechanical failure that caused the Train Derailment.

128.    The Train Derailment resulted in the release of Hazardous Chemicals.

129.    These Hazardous Chemicals are corrosive and can damage metal.

130.    These Hazardous Chemicals drifted through the air onto and into Plaintiffs and Class members' property.

131.    The unauthorized entry of these damaging chemicals onto Plaintiffs and Class members' property constitutes a trespass.

132.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been injured and sustained damages.

## COUNT III
### NUISANCE
**(on behalf of the Class)**

133.     Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

134.     Defendant intentionally, willfully, recklessly, and negligently operated its train loaded with Hazardous Chemicals despite there being a mechanical failure that caused the Train Derailment.

135.     Defendant's intentional, willful, reckless, and negligent transportation of Hazardous Chemicals was abnormally dangerous.

136.     The Train Derailment resulted in the release of Hazardous Chemicals.

137.     These Hazardous Chemicals are corrosive and can damage metal.

138.     These Hazardous Chemicals drifted through the air onto and into Plaintiffs and Class members' property.

139.     The unauthorized entry of these damaging chemicals onto and into Plaintiffs and Class members' property caused unreasonable discomfort to Plaintiffs and Class members, including foul odors, respiratory distress, irritation, and nausea.

140.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been injured and sustained damages.

## COUNT IV
### NEGLIGENCE
**(on behalf of the Class)**

141.     Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

142.     Defendant has a duty to operate its railroads in a safe and responsible manner.

143.    Defendant has a heightened duty of care when dealing with Hazardous Chemicals that can cause injury to people, animals, and the environment.

144.    Defendant breached its duty of care by failing to adequately maintain or operate its trains.

145.    Defendant's breach proximately caused a mechanical failure of an axle on a train carrying Hazardous Chemicals, resulting in a train derailment, leak of Hazardous Chemicals, spread of Hazardous Chemicals throughout the surrounding area, and evacuation.

146.    Defendant's negligence resulted in harm to Plaintiffs and Class members in the form of physical injury, damaged property, incurring of costs and expenses and economic loss.

147.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been injured and sustained damages.

148.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been injured and are entitled to a medical monitoring program to monitor for the risks of illness, diseases and medical conditions caused by exposure to hazardous chemicals.

## COUNT V
### STRICT LIABILITY
### (on behalf of the Class)

149.    Plaintiffs hereby incorporate by reference all preceding paragraphs as though fully set forth herein.

150.    Defendant has a duty to operate its railroads in a safe and responsible manner.

151.    Defendant has a heightened duty of care when dealing with Hazardous Chemicals that can cause injury to people, animals, and the environment.

152.    The transportation of Hazardous Chemicals is an abnormally dangerous activity.

153.    Defendant breached its duty of care by failing to adequately maintain or operate its trains.

154.    Defendant's breach proximately caused a mechanical failure of an axle on a train carrying Hazardous Chemicals, resulting in a train derailment, leak of Hazardous Chemicals, spread of Hazardous Chemicals throughout the surrounding area, and evacuation.

155.    Defendant's negligence resulted in harm to Plaintiffs and Class members in the form of physical injury, damaged property, incurring costs and expenses and economic loss.

156.    Defendant is strictly liable for any injuries proximately caused by the Train Derailment because it was an abnormally dangerous activity.

157.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been injured and sustained damages.

158.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members have been injured and are entitled to a medical monitoring program to monitor for the risks of illness, diseases and medical conditions caused by exposure to hazardous chemicals.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment as follows:

a.    An order certifying this action as a class action;

b.    An order appointing Plaintiffs as Class Representatives, and appointing undersigned counsel as Class Counsel to represent the Class;

c.    A declaration that Defendant is liable under each and every one of the above-enumerated causes of action;

d.    An order awarding compensatory damages, restitution, or refund of all funds acquired by Defendant from Plaintiffs and Class members as a result of Defendant's unlawful conduct as described above, including actual, statutory, and punitive damages to the extent permitted by law in an amount to be proven at trial;

e.    An order establishing a medical monitoring program to monitor for the risks of illness to Plaintiffs and Class members caused by exposure to hazardous chemicals;

f.     An order awarding appropriate preliminary and final injunctive relief against the conduct of Defendant as described above;

g.     An award of attorneys' fees, expert witness fees, and costs, as provided by applicable law or as would be reasonable from any recovery of monies recovered for or benefits bestowed on the Class Members;

h.     Interest as provided by law, including but not limited to pre-judgment and post-judgment interest as provided by rule or statute; and

i.     Such other and further relief as this Court may deem just, equitable, or proper.

## JURY DEMAND

Plaintiffs demand trial by jury.


Dated: February 17, 2023                    Respectfully submitted,

                                            */s/ Andrew Baker*_____

                                            Andrew Baker, Esquire
                                            **THE BAKER LAW GROUP**
                                            89 E. Nationwide Blvd., 2nd Floor
                                            Columbus, OH 43215
                                            Tel: (614) 228-1882
                                            Andrew.baker@bakerlawgroup.net


                                            D. Aaron Rihn, Esquire*
                                            Sara J. Watkins, Esquire*
                                            **ROBERT PEIRCE & ASSOCIATES**
                                            707 Grant Street, Suite 125
                                            Pittsburgh, PA 15219
                                            Tel: (844) 383-0565
                                            arihn@peircelaw.com
                                            swatkins@peircelaw.com

                                            Daniel C. Levin, Esquire*
                                            Charles E. Schaffer, Esquire*
                                            Nicholas J. Elia, Esquire*
                                            **LEVIN SEDRAN & BERMAN**
                                            510 Walnut Street, Suite 500
                                            Philadelphia, PA 19106

Tel: (215) 592-1500
dlevin@lfsblaw.com
cschaffer@lfsblaw.com
nelia@lfsblaw.com

*Pro hac vice admissions to be sought

*Attorneys for Plaintiffs and the Proposed
Classes*